# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| KEVIN FARRAR, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. _____ |
| | § | |
| CORECIVIC OF TENNESSEE, LLC, | § | JURY DEMANDED |
| as owner and operator of TROUSDALE | § | |
| TURNER CORRECTIONAL CENTER, | § | |
| VINCENT VANTELL, and MATTHEW | § | |
| STEVENS, | § | |
| | § | |
| *Defendants.* | § | |

# COMPLAINT

## I. INTRODUCTION

1.  On October 4, 2023, then-inmate Kevin Farrar was violently and repeatedly stabbed by another inmate at Trousdale Turner Correctional Center.

2.  Although the Defendants knew before Mr. Farrar's stabbing that Mr. Farrar's assailant: (1) had just sexually assaulted a nurse at the facility; (2) had demanded to be placed "on max"; and (3) threatened to do something to get moved to a maximum-security cell if prison staff would not meet his demand to move him into a maximum-security cell voluntarily, the facility's Shift Sergeant—Defendant Matthew Stevens—placed Mr. Farrar's assailant in Mr. Farrar's cell instead.

3.  Defendant Stevens did not bother to search Mr. Farrar's assailant before placing him in Mr. Farrar's cell.

4.  After Mr. Farrar's assailant was moved into Mr. Farrar's cell, the assailant

pulled a knife out of his sock and stabbed Mr. Farrar at least seven times.

5. No staff intervened to protect Mr. Farrar while he was being stabbed.

6. Given the severity of his injuries, Mr. Farrar was life-flighted to Vanderbilt University Medical Center and hospitalized. He very nearly died. This lawsuit seeks redress for Mr. Farrar's serious and preventable injuries.

## II. PARTIES

7. Kevin Farrar is a citizen and resident of Bedford County, Tennessee. At all times relevant to this Complaint, Mr. Farrar was incarcerated at Trousdale Turner Correctional Center in Trousdale County, Tennessee. Mr. Farrar may be contacted through counsel.

8. Defendant CoreCivic of Tennessee, LLC—which went by the name "Correction Corporations of America" before that name became synonymous with the most insidious aspects of America's private prison industry—is a private, for-profit prison corporation that cages human beings for money. CoreCivic owns and operates Trousdale Turner Correctional Center, the private prison that allowed Mr. Farrar to be violently assaulted. CoreCivic is a citizen of Tennessee with its principal place of business and corporate headquarters located in Brentwood, Tennessee. CoreCivic may be served with process through its registered agent at CoreCivic of Tennessee, LLC, Registered Agent: C T CORPORATION SYSTEM, 300 MONTVUE RD., KNOXVILLE, TN 37919-5546.

9. Defendant Vincent Vantell is a citizen of Tennessee who at all times relevant to this Complaint was employed as the warden of Trousdale Turner Correctional Center. As Trousdale Turner Correctional Center's day-to-day overseer, Mr. Farrar's assault is attributable to Mr. Vantell's deliberate indifference to Trousdale Turner Correctional Center's chronically unconstitutional understaffing conditions and other known safety

deficiencies. Mr. Vantell may be served at his personal residence located at 245 Indian Lake Blvd., Hendersonville, TN 37075-6289, or wherever he may be found.

10. Defendant Matthew Stevens is a citizen of Tennessee who at all times relevant to this Complaint was employed as a correctional officer at Trousdale Turner Correctional Center. Defendant Stevens may be served at his personal residence located at 2251 Henry Rice Rd., Cookeville, TN 38506-7897, or wherever he may be found.

## III. JURISDICTION AND VENUE

11. This Court has jurisdiction over the Plaintiff's federal claims in this civil action pursuant to 28 U.S.C. § 1331.

12. This Court has supplemental jurisdiction to adjudicate the Plaintiff's state law claims related to Plaintiff's federal claims in this action pursuant to 28 U.S.C. § 1367(a).

13. As the judicial district in which a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

14. Venue is independently proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

## IV. FACTUAL ALLEGATIONS

15. In July 2023, Plaintiff Kevin Farrar informed correctional staff at Trousdale Turner Correctional Center that he was in fear for his life due to an explicit violent threat on his life by a gang member.

16. The gang member who threatened Mr. Farrar told Mr. Farrar that if he did not go to segregation, then the gang member would place a kill-on-sight hit on Mr. Farrar among the other members of his gang.

17.     Mr. Farrar is not gang-affiliated, and he had no way to protect himself from this gang member's credible threat of fatal violence against him.

18.     Thus, Mr. Farrar begged Trousdale Turner Correctional Center staff to place him in protective custody immediately.

19.     CoreCivic declined to grant Mr. Farrar's request.

20.     Instead, Mr. Farrar was given *a disciplinary infraction* for refusing his cell assignment, and he was placed in segregation as a result.

21.     While housed in segregation, in an effort to avoid being murdered, Mr. Farrar continued to request protective custody.

22.     Despite his pleas, Mr. Farrar was not placed in protective custody or assigned protective custody investigation status during this time.

23.     On October 4, 2023, while being held in segregation, Defendant Stevens brought another inmate—Edward Tukes—to Mr. Farrar's cell to be housed with him.

24.     Tukes had been placed in segregation because he had sexually assaulted a nurse at the facility.

25.     Tukes was a known member of the Crips gang, and at the time he was placed in Mr. Farrar's cell, he had violent institutional history.

26.     Before being placed in segregation with Mr. Farrar, Tukes told Defendant Stevens that if he was not placed on maximum security status, then he would do something to ensure he was.

27.     Despite Tukes having made—and communicated to Defendant Stevens—that explicit threat, Defendant Stevens did not even search Tukes before placing him in Mr. Farrar's cell.

28.     Had Defendant Stevens searched Tukes before placing him in Mr. Farrar's

cell, Defendant Stevens would have discovered that Tukes had a contraband weapon in his sock.

29.    After Tukes and Mr. Farrar were in the cell, Defendant Stevens uncuffed both of them through the door and left, leaving the two inmates alone.

30.    Tukes immediately told Mr. Farrar: "You know this isn't gonna work, right?"

31.    As Mr. Farrar began to ask what Tukes meant, Tukes pulled a contraband knife out of one of his socks and began attacking Mr. Farrar.

32.    After being attacked, Mr. Farrar yelled for help.

33.    Defendant Stevens then returned to the cell door where he had just uncuffed the two inmates.

34.    Mr. Farrar was laying on the bottom bunk bed, calling for help while being stabbed by Tukes, and bleeding from his multiple stab wounds.

35.    Rather than enter the cell, Defendant Stevens banged on the door and asked Tukes to stop attacking Mr. Farrar.

36.    Tukes did not stop attacking Mr. Farrar.

37.    Defendant Stevens declined to open the cell door to intervene and stop Tukes from continuing to assault Mr. Farrar.

38.    Defendant Stevens refused to open the cell door and refused to intervene until Tukes voluntarily agreed to drop the knife that he was using to stab Mr. Farrar.

39.    Eventually, Tukes stopped stabbing Mr. Farrar and dropped the knife.

40.    Even then, Defendant Stevens refused to open the cell door and assist Mr. Farrar until *both* inmates were in handcuffs.

41.    After Tukes allowed Defendant Stevens to handcuff him through the door, Mr. Farrar—who was bleeding profusely at this point—continued to beg for help.

42.    While bleeding from multiple stab wounds and in severe distress, Mr. Farrar was instructed to walk himself to the door—in close proximity to the man who had just stabbed him repeatedly—to *himself* be handcuffed.

43.    Finally, after Mr. Farrar was handcuffed, Defendant Stevens opened the cell door.

44.    Mr. Farrar was then transported to Trousdale Turner Correctional Center's medical unit.

45.    While in Trousdale Turner Correctional Center's medical unit, Mr. Farrar's wounds were packed and covered while awaiting an ambulance.

46.    While Mr. Farrar waited for the ambulance to arrive, Defendant Stevens came in to speak with the nurses.

47.    Defendant Stevens told them: "I'm fucked."

48.    When asked why, Defendant Stevens stated: "I put him in the cell with him and didn't even strip search him."

49.    When the ambulance arrived, its entry to the facility was delayed by prison officials at the sallyport.

50.    Mr. Farrar was then loaded onto the ambulance, transported nearby, and life-flighted to Vanderbilt University Medical Center.

51.    One of the stab wounds to Mr. Farrar's right leg—which hit a main artery—only stopped hemorrhaging after an EMT packed the wound and placed a tourniquet on his leg.

52.    At the hospital, Mr. Farrar's right leg wound continued to bleed profusely after providers attempted to remove the tourniquet.

53.    Ultimately, all of Mr. Farrar's stab wounds were examined, treated, and

sutured.

54. After being hospitalized at Vanderbilt University Medical Center, Mr. Farrar was transported to the Lois M. DeBerry Special Needs Facility.

55. After a few hours at DeBerry, Mr. Farrar was transported back to Trousdale Turner Correctional Center.

56. Once back at Trousdale Turner Correctional Center, Mr. Farrar spent one night in medical.

57. While in medical, a nurse apologized to Mr. Farrar.

58. The nurse indicated that she felt responsible for Mr. Farrar's assault because she was the nurse who reported that Tukes had sexually assaulted her, leading to Tukes being placed in segregation with Mr. Farrar.

59. The next day, Mr. Farrar was returned to the segregation cell where he had been stabbed.

60. Mr. Farrar's cell had not been cleaned after his stabbing.

61. Mr. Farrar was instructed by Trousdale Turner Correctional Center's Chief of Security to clean up his own blood from the attack.

62. Mr. Farrar remained in that cell until he was ultimately released from custody in January of 2024.

63. At some point after being stabbed by Tukes, Mr. Farrar was finally placed on protective custody.

64. However, Assistant Warden Bryon Ponds later removed every inmate at Trousdale Turner Correctional Center from protective custody status—including Mr. Farrar—without notification or explanation to the inmates.

65. As a result, Mr. Farrar incurred more disciplinary infractions for refusing

his cell assignment in general population, because Mr. Farrar was now fearful not only of the original gang member who had threatened his life (who was a Vice Lord), but also of Tukes's fellow Crips given that Tukes was now being investigated for attempting to murder Mr. Farrar.

66. To date, Mr. Farrar continues to experience extreme pain, injury, and mental and emotional distress from the assault.

67. Mr. Farrar's right leg also alternates between numbness and a tingling sensation, both of which disrupt his day-to-day life, his ability to work, and his enjoyment of everyday activities.

68. After being violently assaulted, Mr. Farrar exhausted his administrative remedies to the extent they were available to him.

69. Claims for monetary relief are non-grievable under TDOC policy, however, so the grievance process is futile when it comes to addressing claims for monetary relief.

70. Even so, Mr. Farrar filed multiple grievances pertaining to his assault, and he fully exhausted his administrative remedies to the extent possible.

71. As stated in Mr. Farrar's second grievance, Mr. Farrar's first grievance was "never . . . acknowledged, or heard" by Trousdale Turner Correctional Center, and he received no response to it.

72. After his first grievance was ignored by Trousdale Turner Correctional Center staff, Mr. Farrar continued to exhaust the administrative remedies available to him.

73. Mr. Farrar's subsequent grievances were ultimately denied on their merits, including because the "Grievance Procedure cannot award monetary compensation for injuries or property loss."

# V. CAUSES OF ACTION

<u>CLAIM #1: TENNESSEE COMMON LAW NEGLIGENCE</u>
<u>(AS TO DEFENDANTS STEVENS AND VANTELL)</u>

74.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

75.     Defendant Stevens owed a legal duty of care to Mr. Farrar to protect him from reasonably foreseeable inmate-on-inmate violence.

76.     At the time Defendant Stevens placed Tukes in Mr. Farrar's cell, Defendant Stevens was actually aware of the likelihood that Tukes would physically harm Mr. Farrar.

77.     Tukes had informed Defendant Stevens that he would commit an act that warranted moving him to maximum security custody if Tukes were not moved to maximum security as demanded.

78.     Defendant Stevens knew that ignoring Tukes' threat gave rise to a significant and imminent risk of physical harm to Mr. Farrar.

79.     Based on Tukes having recently sexually assaulted a facility nurse, Defendant Stevens knew that Tukes was violent and dangerous.

80.     Based on Tukes' pledge to commit an act sufficient to warrant moving him to maximum security custody if he were not moved to maximum security before then as demanded, Defendant Stevens had actual knowledge that Tukes' cellmate was at serious risk of physical violence.

81.      Before Tukes attacked Mr. Farrar, Defendant Stevens knew or should have known of Tukes' prior institutional history of violent behavior.

82.     Before Tukes attacked Mr. Farrar, Defendant Stevens knew or should have known of Tukes' membership in a violent gang.

83.    Defendant Stevens had actual and constructive notice of the risk of foreseeable harm that Tukes posed to Mr. Farrar if he were placed in Mr. Farrar's cell.

84.    Defendant Stevens knew or should have known that Mr. Farrar would become the victim of a violent attack by Tukes, but he failed to use reasonable care to prevent it.

85.    Defendant Stevens knew that contraband weapons were pervasive at Trousdale Turner Correctional Center, but he failed to use reasonable care to ensure that Tukes was not armed with a contraband weapon before he was placed in Mr. Farrar's cell.

86.    Under institutional policy, Defendant Stevens should have searched Tukes before placing him in Mr. Farrar's cell.

87.    Under institutional policy, Defendant Stevens knew—and he later acknowledged that he knew—that he should have searched Tukes should before placing him in Mr. Farrar's cell.

88.    Defendant Stevens did not search Tukes before placing him in Mr. Farrar's cell.

89.    Based on Defendant Stevens' failure to search Tukes, and because that violation of institutional policy resulted in Mr. Farrar being violently stabbed, Defendant Stevens admitted: "I'm fucked."

90.    Defendant Stevens breached his duties of care to Mr. Farrar.

91.    Defendant Stevens' breaches of his duties of care to Mr. Farrar proximately caused Mr. Farrar to suffer a violent assault at the hands of an armed inmate who told correctional staff he would carry out a threat but was placed in Mr. Farrar's cell while in possession of a contraband knife anyway.

92.    Defendant Stevens' breaches of his duties of care to Mr. Farrar caused Mr.

Farrar to suffer serious physical harm, including multiple stab wounds that caused Mr. Farrar permanent injuries and required emergency hospitalization.

93.     Under Tenn. Code Ann. § 41-1-104(b), "[t]he custody, welfare, conduct and safekeeping of the inmates shall be the responsibility of the warden, who will examine into the affairs of the institution daily to assure that proper standards are maintained."

94.     Defendant Vantell had legal duties to the Plaintiff to ensure that he was reasonably safe from violence at Trousdale Turner Correctional Center and to ensure that proper standards designed to assure the Plaintiff's reasonable safety—including critical staffing standards, contraband search standards, and standards permitting Trousdale Turner Correctional Center to house only nondangerous felony offenders—were maintained.

95.     Defendant Vantell breached these duties of care to the Plaintiff.

96.     Defendant Vantell specifically failed "to assure that proper standards"—including critical staffing standards, contraband search standards, and standards permitting Trousdale Turner Correctional Center to house only nondangerous felony offenders—were "maintained" at Trousdale Turner Correctional Center.

97.     Defendant Vantell's breaches of his duties of care caused Mr. Farrar to suffer serious physical harm, including multiple stab wounds that caused Mr. Farrar permanent injuries and required emergency hospitalization.

<u>CLAIM #2: NEGLIGENCE AND VICARIOUS LIABILITY</u>
<u>(AS TO DEFENDANT CORECIVIC)</u>

98.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

99.     At all times relevant to this Complaint, Defendants Stevens and Vantell were

acting as employees and agents of Defendant CoreCivic.

100.    At all times relevant to this Complaint, Defendants Stevens and Vantell were performing official acts within the regular scope of their employment by Defendant CoreCivic.

101.    Because Defendants Stevens and Vantell were employees of Defendant CoreCivic and were acting as agents of Defendant CoreCivic, Defendant CoreCivic is vicariously liable to the Plaintiff for their negligence.

102.    Based on the relationship between Defendant CoreCivic and Defendants Stevens and Vantell, Defendant CoreCivic is vicariously liable for Defendants Stevens and Vantell's negligence.

103.    Apart from CoreCivic's vicarious liability for Defendants Stevens and Vantell's negligence, CoreCivic is liable to Mr. Farrar for CoreCivic's own direct negligence.

104.    Trousdale Turner Correctional Center is operated by CoreCivic pursuant to a contract with Defendant Trousdale County, Tennessee, a Tennessee municipality.

105.    Trousdale Turner Correctional Center is "not being operated pursuant to the Private Prison Contracting Act of 1986[,]" which permits Defendant CoreCivic to operate directly only a single private prison in Tennessee. *See Friedmann v. Corr. Corp. of Am.*, 310 S.W.3d 366, 378 (Tenn. Ct. App. 2009).

106.    Instead, Trousdale Turner Correctional Center is "being operated pursuant to [a] contract[] with [a] local governmental entit[y] rather than the State of Tennessee, . . . pursuant to the County Correctional Incentives Act of 1981, Tenn. Code Ann. § 41–8–101, et seq." *Id.* at 379.

107.    This Act permits Trousdale County to contract with Defendant CoreCivic to

"house additional **nondangerous** felony offenders locally." Tenn. Code Ann. § 41-8-102 (emphasis added).

108.   CoreCivic is not permitted to house dangerous felony offenders at Trousdale Turner Correctional Center.

109.   This restriction notwithstanding, at the time of the Plaintiff's assault, CoreCivic housed dangerous felony offenders at Trousdale Turner Correctional Center.

110.   Tukes was one such dangerous felony offender.

111.   Tukes was a member of a criminal gang that is made up of dangerous felony offenders.

112.   Tukes' membership in a criminal gang of dangerous felony offenders afforded Tukes easy access to contraband weapons, including the weapon that Tukes used to stab Mr. Farrar.

113.   Despite a statutory prohibition forbidding dangerous felony offenders from being housed at Trousdale Turner Correctional Center, CoreCivic unreasonably failed to exercise due care to ensure compliance with statutory requirements that only nondangerous felony offenders be housed at Trousdale Turner Correctional Center.

114.   CoreCivic's direct negligence caused Mr. Farrar to suffer serious physical harm, including multiple stab wounds that caused Mr. Farrar permanent injuries and required emergency hospitalization.

CLAIM #3: 42 U.S.C. § 1983—DELIBERATE INDIFFERENCE TO AND FAILURE TO PROTECT FROM FORESEEABLE INMATE-ON-INMATE VIOLENCE (AS TO DEFENDANT STEVENS)

115.   The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

116.   At all times relevant to this Complaint, Defendant Stevens had legal duties

under the Eighth Amendment to protect Mr. Farrar from violence at the hands of other prisoners and to ensure Mr. Farrar's reasonable safety at Trousdale Turner Correctional Center.

117.    Defendant Stevens failed to protect Mr. Farrar from a known risk of violence by Tukes which was expressly communicated by Tukes to Defendant Stevens.

118.    Defendant Stevens failed to protect Mr. Farrar from that known and communicated risk by failing to pat down or strip search Tukes before placing him in Mr. Farrar's cell, as institutional policy required.

119.    Defendant Stevens failed to ensure Mr. Farrar's reasonable safety at Trousdale Turner Correctional Center.

120.    Defendant Stevens acted with deliberate indifference to Mr. Farrar's safety while he was housed as an inmate at Trousdale Turner Correctional Center.

121.    Defendant Stevens was actually aware of a specific and particularized risk of serious harm to Mr. Farrar due to Tukes's explicit threat, prior to being placed in Mr. Farrar's cell, to do something that warranted being moved to maximum security.

122.    Despite Defendant Stevens' actual awareness of the specific and particularized risk of serious harm that Tukes posed to Mr. Farrar, Defendant Stevens acted with indifference to the threat and placed Tukes in a cell with Mr. Farrar while Tukes was armed with a contraband weapon.

123.    Even while personally observing Tukes stab Mr. Farrar, Defendant Stevens took no meaningful action to intervene and stop Mr. Farrar from being assaulted.

124.    Due to Defendant Stevens' deliberate indifference to a violent assault being perpetrated against Mr. Farrar *that Defendant Stevens was personally observing*, Mr. Farrar suffered several additional stab wounds that Defendant Stevens could have

prevented by intervening but chose not to.

125.     As a result of Defendant Stevens' deliberate indifference to Mr. Farrar's safety and his failure to protect Mr. Farrar from inmate-on-inmate violence,  Mr. Farrar suffered serious physical injuries, including multiple stab wounds that caused Mr. Farrar permanent injuries and required emergency hospitalization.

CLAIM #4: UNCONSTITUTIONAL POLICY, PATTERN, AND PRACTICE UNDER
*MONELL V. DEPT. OF SOCIAL SERVICES*, 436 U.S. 658 (1978)
(AS TO DEFENDANTS CORECIVIC AND VANTELL)

126.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

127.     Maintaining constitutionally adequate staffing levels is necessary to ensure the safety of the inmates at Trousdale Turner Correctional Center.

128.     Maintaining constitutionally adequate staffing levels is necessary to ensure that inmates like Mr. Farrar are protected from inmate-on-inmate violence.

129.     Maintaining constitutionally adequate staffing levels is necessary to ensure that Trousdale Turner Correctional Center is meaningfully searched for and cleared of contraband weapons.

130.     CoreCivic has an unconstitutional policy or practice of maintaining staffing levels at Trousdale Turner Correctional Center that are insufficient to ensure that inmates like Mr. Farrar are protected from inmate-on-inmate violence.

131.     The State of Tennessee defines a "critical post" as "a security position" that "would jeopardize the immediate security and safety of the facility, staff, offenders, or community" if left unfilled.[1]

---

[1] Tennessee Comptroller of the Treasury, Performance Audit Report, Department of Correction (Dec. 2023) at 8, https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2023/pa23025.pdf.

132.     Defendant CoreCivic has adopted a policy and practice of severely understaffing critical posts at its facilities, including Trousdale Turner Correctional Center, without regard to inmate safety because understaffing is more profitable.

133.     To maintain its profit margin—and as a result of its chronic and profit-motivated deliberate indifference to inmate health and safety—CoreCivic serially underinvests in prison staff, security, and inmate healthcare at its prisons, leading to predictable and horrific results.[2]

134.     On August 20, 2024, the United States Department of Justice announced "that it ha[d] opened an investigation into the conditions at Trousdale Turner Correctional Center, a Tennessee Department of Correction facility operated by the private correctional management company CoreCivic."[3]

135.     As grounds for its investigation, the Department announced that, "[b]ased on an extensive review of publicly available information and information gathered from stakeholders, the department has found significant justification to open this investigation, including state audits that have flagged dangerous understaffing and safety concerns since Trousdale Turner first opened in 2016.  The investigation will examine

---

[2] *See, e.g.*, Allison Kite, *For-profit Kansas prison an understaffed 'hell hole' of violence, death and drugs*, KANSAS REFLECTOR (Oct. 7, 2021), https://kansasreflector.com/2021/10/07/for-profit-kansas-prison-an-understaffed-hell-hole-of-violence-death-and-drugs/; Samantha Michaels, *The Feds Just Slammed One of the Country's Biggest Private Prison Companies—Once Again*, MOTHER JONES (April 26, 2017), https://www.motherjones.com/politics/2017/04/justice-department-audit-corecivic-marshal-service-leavenworth/; Cassandra Stephenson, *A TN inmate was fatally beaten for coffee at a private prison. His widow seeks justice*, JACKSON SUN (May 29, 2019), https://www.jacksonsun.com/story/news/2019/05/29/corecivic-tennessee-lawsuit-alleges-inmate-died-due-understaffing-lack-medical-care-earl-johnson/1272710001/; Daniel Arkin, *Tennessee Audit Finds Rampant Understaffing, Other Issues at Prisons*, NBC NEWS (Nov. 14, 2017), https://www.nbcnews.com/news/all/tennessee-audit-finds-rampant-understaffing-other-issues-prisons-n820746.

[3] *Press Release: Justice Department Announces Civil Rights Investigation into Conditions at Tennessee's Trousdale Turner Correctional Center*, U.S. DEP'T OF JUSTICE OFFICE OF PUBLIC AFFAIRS (Aug. 20, 2024), https://www.justice.gov/opa/pr/justice-department-announces-civil-rights-investigation-conditions-tennessees-trousdale.

whether Tennessee protects those incarcerated at Trousdale Turner from harm, including physical violence and sexual abuse."

136. CoreCivic's understaffing has routinely resulted in hundreds or thousands of critical posts at Trousdale Turner Correctional Center being unfilled or understaffed each month.

137. Because Trousdale Turner Correctional Center was chronically short of critical staff, it failed to complete meaningful searches for contraband weapons, thereby allowing contraband weapons like the one that Tukes used to stab Mr. Farrar to go undetected and proliferate the facility.

138. Because Trousdale Turner Correctional Center was chronically depleted of critical staff at the time of Mr. Farrar's assault, its ability to respond promptly to violent incidents like Mr. Farrar's assault was seriously impaired.

139. Because Trousdale Turner Correctional Center was chronically depleted of critical staff at the time of Mr. Farrar's assault, staff members were often left alone and without backup support when a violent incident erupted.

140. Due to guards' unwillingness to enter a cell alone—and given the extended delay that resulted from having to call staff members in from other pods—assaults like the one to which Mr. Farrar was subjected were permitted to continue for an extended time period without staff intervention due to CoreCivic's understaffing policy.

141. Due to the rampant staffing deficiencies at Trousdale Turner Correctional Center —which CoreCivic has allowed to go unremedied for years—Mr. Farrar joined the long list of inmates who were subjected to preventable inmate-on-inmate violence at Trousdale Turner Correctional Center.

142. During multiple consecutive quarters leading up to Mr. Farrar's assault,

CoreCivic received notices from the Tennessee Department of Correction detailing Trousdale Turner Correctional Center's consistent and severe noncompliance with minimum contractual critical staffing requirements.

143.     Due to multiple audits and regular liquidated damages assessments identifying Trousdale Turner Correctional Center's severe understaffing of critical posts, and due to thousands of violent incidents—both reported and unreported—at the facility over a period of years, CoreCivic and its on-site policymakers had actual knowledge of Trousdale Turner Correctional Center's chronic understaffing problems at the time of the Plaintiff's assault, but CoreCivic chose not to staff critical posts at Trousdale Turner Correctional Center adequately.

144.     Trousdale Turner Correctional Center had vacant critical staffing posts every single day of the year Mr. Farrar was assaulted.

145.     At the time of Mr. Farrar's assault, CoreCivic's employees—including Defendant Vantell, its on-site policymaker—had actual knowledge that Trousdale Turner Correctional Center's chronic understaffing problems resulted in an extraordinary and outsized level of contraband weapons and inmate-on-inmate violence at the facility.

146.     CoreCivic's policy and practice of understaffing critical posts is widespread, rampant, and endemic to CoreCivic's Tennessee prison facilities, including and especially Trousdale Turner Correctional Center.

147.     Defendants CoreCivic and Vantell, CoreCivic's on-site policymaker, knew of the heightened and chronic safety risks to inmates resulting from understaffing critical posts at Trousdale Turner Correctional Center, but they tolerated, maintained, and promoted understaffing to generate greater profits for CoreCivic at the expense of the safety of inmates like Mr. Farrar.

148.    Mr. Farrar's violent assault with a deadly weapon is attributable to Defendant CoreCivic's policy and practice of failing to ensure adequate staffing at Trousdale Turner Correctional Center, which was explicitly or impliedly authorized by Defendant Vantell and in which he knowingly acquiesced in accordance with CoreCivic's policy, custom, and practice of understaffing CoreCivic's Tennessee prison facilities.

149.    If Trousdale Turner Correctional Center had been properly staffed and searched for contraband weapons, Mr. Farrar would not have been stabbed with a contraband weapon.

150.    If Trousdale Turner Correctional Center had been properly staffed, Mr. Farrar would not have been stabbed repeatedly for an extended time period without any staff intervening to stop the assault from continuing.

151.    Trousdale Turner Correctional Center's chronic understaffing continued to remain unremedied even after Mr. Farrar's assault.

152.    As a result of Defendant CoreCivic's unconstitutional policy, pattern, and practice of understaffing, Mr. Farrar suffered serious physical injuries, including multiple stab wounds that caused Mr. Farrar permanent injuries and required emergency hospitalization.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for the following relief:

1.  That proper service issue and be served upon the Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

2.  That the Plaintiff be awarded all compensatory, consequential, and incidental damages to which the Plaintiff is entitled in an amount not less than $1 million;

3. That the Plaintiff be awarded punitive damages in an amount not less than $2 million;

4. That the Plaintiff be awarded reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988(b);

5. That a jury of 12 be empaneled to try this cause;

6. That pre-judgment and post-judgment interest be awarded to the Plaintiff; and

7. That the Plaintiff be awarded all further relief to which the Plaintiff is entitled.

Respectfully submitted,

/s/ Daniel A. Horwitz_____
DANIEL A. HORWITZ, BPR #032176
MELISSA K. DIX, BPR #038535
SARAH L. MARTIN, BPR #037707
HORWITZ LAW, PLLC
4016 WESTLAWN DR.
NASHVILLE, TN 37209
daniel@horwitz.law
melissa@horwitz.law
sarah@horwitz.law
(615) 739-2888

*Counsel for Plaintiff*